## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

VIKKI L. ARRIOLA,

                    **Plaintiff,**

    vs.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

                    **Defendant.**

**CASE NO.  4:13CV3079**

**MEMORANDUM
AND ORDER**

Vikki L. Arriola filed a complaint on April 9, 2013, against Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration.  (ECF No. 1.)  Arriola seeks a review of the Commissioner's decision to deny her application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq.,  and for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. The defendant has responded to Arriola's complaint by filing an answer and a transcript of the administrative record.  (See ECF Nos. 10, 11).  In addition, pursuant to the order of Senior Judge Warren K. Urbom, dated July 9, 2013, (ECF No. 18), each of the parties has submitted briefs in support of her position.  (See generally Pl.'s Br., ECF No. 19; Def.'s Br., ECF No. 27). After carefully reviewing these materials, the court finds that the Commissioner's decision must be affirmed.

### I. PROCEDURAL HISTORY

Arriola, who was born on January 15, 1971, (Tr. 44) filed an application for disability benefits under Title II and supplemental security income benefits under Title XVI on May 17, 2010. (Tr. 100-05). Her claim was denied initially on August 10, 2010,

and on reconsideration on January 27, 2011. (Tr. 49, 55). Arriola requested a hearing before an administrative law judge (ALJ) (tr. 63), and the hearing was held on October 20, 2011. (Tr. 23-42). In a decision dated March 30, 2012, the ALJ found that Arriola was not disabled. (Tr. 15).

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See id.* Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). The ALJ found that Arriola had not been engaged in substantial gainful activity since April 7, 2009, the alleged onset date of disability. (Tr. 11).

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20

2

C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find

that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c).  The ALJ found

that Arriola had the following severe impairments: diffuse myalgias; borderline

intellectual functioning; and bipolar disorder. (Tr. 11).

Step three requires the ALJ to compare the claimant's impairment or impairments

to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part

404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the

claimant has an impairment "that meets or equals one of [the] listings," the analysis

ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d).

If a claimant does not suffer from a listed impairment or its equivalent, then the analysis

proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ found that

Arriola did not have an impairment or combination of impairments that met or medically

equaled the severity of one of the listed impairments.

Step four requires the ALJ to consider the claimant's residual functional capacity

(RFC)[1] to determine whether the impairment or impairments prevent the claimant from

engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the

claimant is able to perform any past relevant work, the ALJ will find that the claimant is

not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). The ALJ found that Arriola was

capable of performing past relevant work as a cashier, work which did not require the

performance of work-related activities precluded by Arriola's RFC. (Tr. 15).

---

[1]    "'Residual functional capacity' is what the claimant is able to do despite limitations
caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir.
2000) (citing 20 C.F.R. § 404.1545(a)).

At step five, the ALJ must determine whether the claimant is able to do any other work considering her RFC, age, education, and work experience. If the claimant is able to do other work, she is not disabled. The ALJ determined that Arriola had the RFC to perform light work as defined in 20 C.F.R. §§ 404. 1567(b) and 416.967(b) except she is limited to work involving simple to intermediate level instructions and involving only superficial contact with the public. (Tr. 12).

The ALJ found that Arriola had not been under a disability from April 7, 2009, through the date of the decision. (Tr. 15). The Appeals Council of the Social Security Administration denied Arriola's request for review on February 16, 2013. (Tr. 1-5.) Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Arriola seeks judicial review.

## II. FACTUAL BACKGROUND

### A.    Medical Evidence

In her application for disability benefits, Arriola stated that she had bipolar disorder, was manic, had fibromyalgia, and had anger issues. (Tr. 148). She has submitted medical evidence of both physical and mental health issues, and the ALJ determined that she had both physical and mental health impairments, which were intertwined because of Arriola's history of drug abuse and overuse.[2]

Arriola was treated for mental health concerns by Tamara R. Johnson, M.D. Shortly before the alleged onset date, on February 10, 2009, Arriola went to Dr. Johnson for a medication checkup. Dr. Johnson stated that Arriola had been overusing

---

[2] Although Arriola has submitted medical records dating from 1997, she alleged an onset of disability of April 2009. The court has therefore reviewed all medical records, but has relied mainly on those from 2009 to the time of the hearing.

4

Ultram, a pain medication, for dental problems. Dr. Johnson advised Arriola to stagger Ultram with ibuprofen. Arriola was cheerful and her mood was good. Dr. Johnson adjusted Arriola's other medications. (Tr. 244).

Arriola had teeth pulled and went to a clinic for pain medication on March 25, 2009. The clinic refused to give her any pain medications because she had multiple prescriptions for different narcotics from different providers. (Tr. 557).

Arriola worked as a cashier at Wal-Mart for more than 10 years, but she reported to Dr. Johnson on May 7, 2009, that she was fired for minor infractions. She said she was receiving unemployment benefits, and she had started work as a hotel housekeeper. (Tr. 243). Dr. Johnson reported that Arriola was handling the stress, was sleeping well, and was not depressed. Arriola said she was taking all medications as prescribed. (Tr. 243).

On July 2, 2009, when Arriola broke a tooth which was infected, the clinic gave her an antibiotic to prevent infection and Tylenol with codeine, but she was told she could not get more of the pain medication. (Tr. 555). On July 15, 2009, Arriola was struggling because she could not find work and had financial worries. (Tr. 242). Dr. Johnson did not observe any mania, psychosis, or suicidal thoughts. She prescribed Lexapro. (Tr. 242). Arriola again sought help for mouth pain on July 27, 2009, and was given Vicodin, but the doctor noted that she had been in eight times since January seeking pain medication. (Tr. 554).

On August 3, 2009, Arriola went to the clinic for a medication check and was told she was taking too much medication. (Tr. 553). She had taken more than 2200 pills of tramadol in the first seven months of the year. The same day, she went to a clinic for an

5

injury to her right wrist. She said she had multiple pain medications at home, but had not taken any. She was diagnosed as having a contusion and advised to use ice and rest for 48 hours. (Tr. 552).

Dr. Johnson noted on August 6, 2009, that Arriola was doing much better since taking Lexapro. (Tr. 241). There had been no side effects, and Arriola was pleased with her emotional state. She was calm and focused and back to her usual optimistic self. (Tr. 241).

On August 27, 2009, Arriola went to the emergency room for a first degree burn to her right foot. (Tr. 255-56). Although she limped, the clinician noted that her gait was normal. She was discharged with directions on taking care of the injury. (Tr. 256).

Arriola reported that she was highly stressed on November 25, 2009, because her boyfriend's father was living in her house and the situation was deteriorating. (Tr. 239). Arriola wanted a medication to fix her problems, but Dr. Johnson told her she needed counseling, and Arriola agreed. Dr. Johnson had learned that Arriola was filling prescriptions for pain medication at different pharmacies. Arriola admitted that she had gotten prescriptions from a dentist, but she said she was no longer taking the narcotics. Dr. Johnson confirmed that Arriola had not filled the prescriptions for more than one month. Dr. Johnson noted that Arriola was not as hysterical as she had been earlier in the month and there were no signs of mood instability. (Tr. 239).

On February 18, 2010, Arriola reported to Dr. Johnson that the increase in Lexapro had helped and she was less anxious. (Tr. 238). Her depression was better, but she continued to have dental pain. She was scheduled to receive dentures in one month. Dr. Johnson determined that Arriola had not filled a prescription for pain

medications recently, so Dr. Johnson prescribed a one-month supply of hydrocodone. (Tr. 238).

On March 26, 2010, Arriola reported to Natalie A. Waskowiak, P.A., that she had fibromyalgia and pain throughout her body. (Tr. 269). Arriola's posture, gait, sensation, and strength were all normal. She was prescribed Lyrica and told to decrease her tramadol use, which was more than the maximum recommended dosage. (Tr. 271).

Arriola presented to Julie A. Johng, A.P.R.N., on April 15, 2010, after she slipped on some steps and developed back pain. (Tr. 267). Arriola was diagnosed with thoracic or lumbosacral neuritis or radiculitis, unspecified. Because Arriola was unemployed and had no insurance, she did not want to start physical therapy. She was given oxycodone and Soma for severe pain and spasms. (Tr. 268). She returned four days later and reported that the oxycodone had caused her to vomit. She was given a trial of Vicodin and told to use moist heat on her lower back. (Tr. 265).

Arriola went to the emergency room on April 22, 2010, and was admitted for abdominal pain. (Tr. 248). Tests were negative for appendicitis, but showed moderate constipation. (Tr. 248, 254). It was noted that she had extreme anxiety and threw her food tray and a couple of bottles of magnesium citrate at the nurses. She was given Ativan for anxiety and responded well. It was recommended that she follow up with Dr. Johnson for uncontrolled anxiety and bipolar disorder. (Tr. 248).

Arriola went to Dr. Johnson for medication management on April 30, 2010. (Tr. 236). Arriola presented as histrionic and dramatic and explained that her boyfriend of 13 years did not understand bipolar symptoms and thought she was drinking alcohol again. Arriola reported that she had applied for a job but was not hired because she had a

positive pre-employment drug scan, but she denied using drugs or alcohol. Arriola said she was depressed and felt manic all the time. She said she stopped taking Lexapro on Dr. Johnson's advice, but Dr. Johnson had no record of that recommendation. Arriola had not sought counseling, which Dr. Johnson had recommended a number of times. By the end of the appointment, Arriola was calm. Dr. Johnson's impression was a history of bipolar disorder, social environmental stress, and a history of alcohol abuse. (Tr. 236). After Arriola left the appointment, Dr. Johnson contacted the pharmacy and found that Arriola had filled a prescription for 1200 tablets of Ultram since January 12, which was a 150-day supply. (Tr. 237). Dr. Johnson had prescribed a 30-day supply, but Arriola began paying cash to bypass the patient assistance program. Dr. Johnson learned that Arriola had gotten prescriptions from three or four different doctors for Vicodin, Vicoprofen, Darvocet, Percocet, and hydrocodone. When Dr. Johnson could not reach Arriola, Dr. Johnson planned an intervention at her next appointment. Dr. Johnson noted that Arriola's abuse of narcotic drugs was probably making her mood unstable and she was demonstrating classic addictive behavior. (Tr. 237).

Arriola again saw Waskowiak on May 3, 2010, for back pain. (Tr. 261). Arriola was told to consider physical therapy and to limit her Vicodin use. (Tr. 263). A lumbar spine x-ray showed that Arriola's alignment was within satisfactory limits. There was mild narrowing at L5-S1 which was stable. (Tr. 247).

Dr. Johnson asked Arriola to come in on May 25, 2010, to confront her about her narcotic abuse. (Tr. 284). Dr. Johnson noted that Arriola's appearance was the opposite of what it had been on April 30, 2010. She was calm, focused, nicely groomed and dressed, looked bright-eyed, and her speech was not slurred. Arriola reported that she

was emotionally abused by her boyfriend, who was her only source of support. Arriola said she felt less manic and depressed and was able to focus. (Tr. 284). Arriola accepted Dr. Johnson's intervention and admitted that she may have abused medications for fear of being in pain. (Tr. 285). Arriola agreed to see only one clinic and to inform them about her past narcotic and alcohol abuse. She understood that the pharmacies were monitoring her and would notify Dr. Johnson if she filled a prescription for a scheduled drug. Dr. Johnson recommended mental health or substance abuse counseling, but Arriola declined. (Tr. 285).

On May 26, 2010, Arriola again saw Waskowiak for back pain. She asked for a refill of tramadol and was also taking Vicodin. (Tr. 323). She stated that she could not afford physical therapy, and it was recommended that she contact a physical therapy office to determine its cost. (Tr. 325). She was told she needed to taper off the Vicodin which was only for acute pain. (Tr. 325). She denied any decreased range of motion or pain, stiffness, or swelling in her joints. (Tr. 324). She had normal sensation, posture, gait, strength, coordination, and reflexes. (Tr. 324-25).

Arriola saw Waskowiak on June 4, 2010, for leg pain that had been occurring for two days. (Tr. 326). She was diagnosed with lumbago. Her Lyrica was increased, and she was advised to decrease her use of narcotics. (Tr. 328). Three days later, Arriola reported that her boyfriend had flushed all her medications in the toilet. (Tr. 329). She admitted she had been noncompliant with her treatment plan. (Tr. 329). Arriola was told that her Vicodin prescription would not be refilled due to her recent behaviors. She was instructed to contact Dr. Johnson for her psychotropic medications. (Tr. 331).

On June 9, 2010, Arriola went to the hospital after falling at work and hurting her back. (Tr. 797). X-rays showed normal alignment. (Tr. 800). She was diagnosed with a thoracic and lumbar strain and was advised to use ice and avoid strenuous activity. (Tr. 799). The next day, she was admitted to the hospital when she said she wanted to enter a detoxification program. She had the "shakes" and was intoxicated. (Tr. 890, 897). Her discharge diagnosis on June 11, 2010, indicated that she had narcotic dependence and overdose, polysubstance abuse, history of alcoholism, isopropyl alcohol intake, benzodiazepine dependence, and suspected depression. (Tr. 898). A psychiatric evaluation showed that Arriola did not meet the criteria for inpatient psychiatric hospitalization. She was put on a waiting list for inpatient rehabilitation. (Tr. 898).

Arriola began inpatient treatment on June 22, 2010. She reported that she wanted to stop taking pain killers and that her significant other told her to go to the hospital and tell them she drank rubbing alcohol. (Tr. 279). She denied drinking alcohol but admitted to being addicted to pain medications. She reported experiencing depression and anxiety, but denied any suicidal ideation. Arriola reported she had twice attended residential treatment for substance abuse and had received outpatient treatment four times. She was diagnosed as opioid/heroin/methadone/morphine, unspecified, and alcohol dependent. (Tr. 282).

Eric R. Schwartzkopf, M.D., saw Arriola on July 1, 2010, for edema and redness of her left lower leg. (Tr. 335). She had been wearing sandals with rough leather straps, which in conjunction with alcohol and polysubstance abuse, had worn sores on the top of her foot. She was wearing softer sandals and the abrasions were nearly completely healed. (Tr. 337). She also complained of diffuse myalgias and arthralgias. (Tr. 337).

10

Her Lyrica was increased and Dr. Schwartzkopf noted that she was doing well from a mental health standpoint. (Tr. 338, 354).

From July 15, 2010, to September 15, 2010, Arriola attended substance abuse treatment at St. Monica's in Lincoln, Nebraska. (Tr. 339, 415-17). On September 22, 2010, Arriola went to the emergency room after she allegedly drank some rubbing alcohol in an attempt to commit suicide. (Tr. 351, 862). She returned to the hospital on September 27, 2010, and was admitted to the psychiatric unit. (Tr. 847). She was discharged on October 5, 2010. (Tr. 849). On October 8, 2010, Arriola was readmitted due to drinking rubbing alcohol. (Tr. 807, 832). She was diagnosed with mood disorder, history of bipolar disorder, and opiate dependence, benzodiazepine dependence, and polysubstance dependence. (Tr. 807). She was discharged on October 12, 2010, when her depression was stabilized and her anxiety was mitigated. The treatment team believed she could benefit from a program like St. Monica's, and Arriola was agreeable. (Tr. 808).

She also underwent a psychiatric evaluation at the hospital. (Tr. 810). Her affect was mood congruent. (Tr. 812). She was diagnosed with a mood disorder. It was recommended that she be admitted as an inpatient in the psychiatric unit. (Tr. 813). She denied using any drugs, but when challenged that her drug screen was positive for benzodiazepine, she eventually admitted that a friend had given her Xanax for anxiety. (Tr. 813).

Arriola relapsed after leaving St. Monica's, stealing and ingesting her roommate's pills, and drinking rubbing alcohol, hairspray and vodka. (Tr. 412). She was readmitted on October 14, 2010, and discharged on December 21, 2010. She was diagnosed with

alcohol dependence, opioid dependence (Vicodin), bipolar disorder, not otherwise specified. (Tr. 412). On discharge, it was recommended that Arriola participate in individual sessions and community support services. If she was not able to maintain her sobriety or mental health needs in the shelter, it was recommended that she transition into a supportive home such as St. Monica's or Fresh Start. (Tr. 414).

In January 2011, Arriola went to the hospital for back pain on two occasions, and for abdominal pain. (Tr. 1026-29). She had her gall bladder removed on January 19, 2011. (Tr. 1020). In February 2011, she returned to the hospital and the clinic for abdominal pain and back pain. (Tr. 1004, 525). The doctor noted it was difficult to keep Arriola's records straight because she saw multiple physicians and providers. (Tr. 525). She continued to complain of back pain in February 2011. (Tr. 523-24, 996-97).

On March 8, 2011, Arriola saw Dr. Johnson for the first time since May 25, 2010. (Tr. 455). She had been released from a community support program because she was getting Soma from a physician's assistant. Arriola said she did not realize it was an addictive substance. She had been living in a homeless shelter and married a fellow resident, who was also awaiting a disability claim. Arriola did not appear overtly manic or pressured. Dr. Johnson adjusted her medications. (Tr. 456).

On March 14, 2011, Arriola was admitted to the hospital after complaining of chest pain. (Tr. 970, 976). After a stress test, it was determined that Arriola did not have ischemia and her left ventricular systolic function was normal. (Tr. 987). No acute cardiopulmonary abnormality was found. (Tr. 988). On March 24, 2011, Arriola went to the clinic for nausea, vomiting, diarrhea, and pain. She asked for more tramadol, but she reported that she still had some from a previous prescription. (Tr. 520). She was

diagnosed with gastroenteritis. (Tr. 520). She returned for chest pain on March 29, 2011. (Tr. 957). She was discharged in stable condition and directed to see a physician for further evaluation to check abnormal laboratory results. (Tr. 963).

Arriola was in the hospital between April 7 and 13, 2011. (Tr. 910). She was again diagnosed with a mood disorder after reporting that she drank isopropyl alcohol as an attempt at suicide. (Tr. 910-11, 926).

On June 23, 2011, Arriola went to the hospital complaining of rectal bleeding and abdominal pain that had started several weeks earlier. (Tr. 500). The clinical impression was diarrhea, and she was discharged in good condition. (Tr. 503). On July 5, 2011, she was seen for a recheck of fibromyalgia pain and reported that tramadol had worked well, but she was told she could not refill it more than once a month. (Tr. 515).

Arriola went to the emergency room for neck pain on September 6, 2011. (Tr. 487). She was released with medication. (Tr. 491). She returned on September 8, 2011, complaining of chest pain. (Tr. 462). A stress test was negative, and it was noted that Arriola had a long history of drug-seeking behavior and complained of pain even after being given morphine. She was put on a non-steroidal medication with a muscle relaxant and she was discharged the next day in improved condition. (Tr. 474). The pain was believed to be musculoskeletal. (Tr. 477).

On September 13, 2011, Arriola went to Shawn Murdock, M.D., complaining of anxiety, difficulty concentrating, insomnia, and panic attacks, beginning about two months earlier. (Tr. 509). She was started on Klonopin (Tr. 510). She returned to Dr. Murdock on September 27, 2011, complaining of low back pain which started after she fell at home. (Tr. 506). An x-ray showed no fracture and it was determined she likely

13

had a contusion or sprain. (Tr. 508). The next day, she returned, complaining of anxiety. (Tr. 504). She was told she would not be given any more Klonopin because she was taking too many. (Tr. 505).

## B.   Medical Opinion Evidence

Arriola underwent several psychological and physical examinations. The first was a psychiatric review technique completed by Lee Branham, Ph.D., on July 5, 2010. (Tr. 292). He found that she had bipolar disorder, a medically determinable impairment, and an affective disorder. (Tr. 295, 300). Although he found that Arriola appeared to have bipolar disorder, he also opined that her present mood instability was most likely due to drug and alcohol abuse. (Tr. 304). Branham suggested that Arriola's bipolar disorder symptoms were not as severe as suggested by her subjective complaints and that currently she had no condition that was of a severity to prevent all work. (Tr. 304). Arriola had mild restriction in activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence, or pace. (Tr. 302). Branham found insufficient evidence of episodes of decompensation. (Tr. 302). He noted that Dr. Johnson had described Arriola as overdramatizing her situation and having shown contradictory behavior on a chance observation outside the office. Dr. Johnson's subsequent research showed Arriola's excessive use of pain medication. (Tr. 304).

Branham completed a mental RFC assessment of Arriola on July 5, 2010. (Tr. 306). He determined that Arriola had no significant limitations in the ability to remember locations and worklike procedures and to understand, remember and carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain

an ordinary routine without special supervision; the ability to make simple work-related decisions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and the ability to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 306-07). Arriola had moderate limitations in the ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, and to work in coordination with or proximity to others without being distracted by them. (Tr. 306). Arriola was not significantly limited in social interaction, except that she had moderate limitation in the ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 307). She also had no significant limitations in adaptation, except moderate limitation in the ability to set realistic goals or make plans independent of others. (Tr. 307).

Branham stated that Arriola's bipolar disorder and addictions were likely to create some problems with attention and concentration, to the point that she would have difficulty handling detailed instructions, but there was no evidence of an inability to handle simple instructions. (Tr. 308). She appeared emotionally overreactive, so she was likely to be moderately distracted by others. Branham said the impulsive aspects of her bipolar disorder and addictions would create some difficulty dealing with supervisors at a moderate level. Her history of addictions represented a deficit in judgment that would lead to a moderate limitation in independent planning in financial and other areas. Branham stated that even with all conditions, Arriola's impairments did not meet or exceed any listing. (Tr. 308).

On December 23, 2010, Sarah K. Schaffer, Ph.D., completed a psychological report. (Tr. 362). Arriola acknowledged that her substance abuse interfered with her work performance and attendance. (Tr. 363). Arriola reported periods of depressed mood, severe guilt, shame, worthlessness, hopelessness, and helplessness. She also recalled past episodes of elevated mood, racing thoughts, distractibility, pressured speech, and disrupted sleep initiation and maintenance. (Tr. 363). Arriola reported that she had been sober since October 8, 2010. (Tr. 364). She had previously been admitted as an inpatient six times and attended residential substance abuse/mental health facilities on eight occasions. (Tr. 364).

During the interview, Schaffer found that Arriola's thought processing was linear and goal directed. (Tr. 364). There was no evidence of perceptional disturbances or delusional thought content. (Tr. 365). Her self-esteem, insight, and judgment were poor. She was diagnosed with alcohol dependence, early full remission (per patient report), bipolar disorder not otherwise specified, opiate dependence, pain disorder associated with both psychological factors and general medical condition, and anxiety disorder not otherwise specified. (Tr. 365). Schaffer stated that Arriola's prognosis was poor. (Tr. 366).

Christopher Milne, Ph.D., completed a psychiatric review technique of Arriola on January 1, 2011. (Tr. 370). He affirmed Branham's psychiatric review technique of July 5, 2010. (Tr. 370).

Rebecca A. Schroeder, Ph.D., completed a medical source statement of ability to do work-related activities (mental) on January 24, 2012. (Tr. 1033). Schroeder stated that Arriola had bipolar disorder including irritable mood and anger issues. (Tr. 1034).

She also had alcohol dependence, and personality disorder, not otherwise specified, with borderline features. She had been sober from alcohol for one year, but she continued to overuse and abuse prescription medications. (Tr. 1034). She had limited financial abilities and poor math skills and could not manage money in her own best interest. (Tr. 1035). Schroeder said Arriola had an IQ of 70 and mild limitations in the ability to understand, remember, and carry out simple instructions and in interacting appropriately with the public, with supervisors, and with co-workers. She had moderate limitations in the ability to make judgments on simple work-related decisions and to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 1034). She had marked limitations in the ability to understand, remember, and carry out complex instructions, and extreme limitations in the ability to make judgments on complex work-related decisions. (Tr. 1033).

Schroeder noted that during the interview, Arriola's mood was dysphoric, her affect was restricted and she did not display a wide range of emotion. (Tr. 1045). Schroeder stated that Arriola's prognosis for her mental health issues was only fair to poor. She seemed vulnerable to using pain relievers for her mental health issues. She also seemed to have motivational problems and had a tendency to leave treatment before she had benefited from it. (Tr. 1047).

On August 4, 2010, Gerald Spethman, M.D., completed a physical RFC assessment. (Tr. 311). He determined that Arriola could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (Tr. 312). She could stand, walk, or sit about six hours in an eight-hour workday. Arriola was unlimited in her ability to push. (Tr. 312). She had no postural, manipulative, visual, communicative, or environmental

17

limitations. (Tr. 313-15).  Dr. Spethman stated that Arriola's conditions did not meet or equal any listings. Her recent lumbar back pain after a fall should resolve in time. (Tr. 318). Dr. Spethman noted that Arriola's chronic pain had been labeled as both myalgia and fibromyalgia, but because there were no specific workups for referrals for fibromyalgia, it appeared the term was used for diffuse myalgias and chronic musculoskeletal pain. Arriola's gait and strength had been good throughout the medical records. Dr. Spethman stated there was some question of psychological overlay to her physical complaints. She appeared capable of lighter work activity. (Tr. 318).

Glen Knosp, M.D., completed a physical RFC of Arriola on January 24, 2011. (Tr. 371). Knosp noted that Arriola stated in her application for reconsideration that her condition had changed in July 2010. She reported back and leg pain which made it difficult for her to sit. She reported that she tried to play volleyball in August 2010 and had an increase in pain symptoms. Dr. Knosp's impression was myalgia and myositis unspecified and bipolar disorder unspecified. (Tr. 371).  A review of the overall evidence indicated that Arriola had a condition that may have periods of exacerbation of pain symptoms if she increased activity. She also reported good control of symptoms with her medications. Dr. Knosp found no evidence to support a medically determinable impairment related to her alleged leg pain. She had full strength, there was no mention of inability to move about in a satisfactory manner, and her most recent physical exam appeared to be somewhat normal. (Tr. 371). Dr. Knosp concluded that Arriola was capable of work as outlined in the RFC, and it was affirmed. (Tr. 371-72).

**C.    Hearing Evidence**

At a hearing on October 20, 2011, Arriola testified that she had been sober for one year and that she attended Alcoholics Anonymous meetings. (Tr. 26-27). She graduated from high school and had worked as a cashier at Wal-Mart for 10½ years. (Tr. 27-28). Arriola said she was fired because they thought she had gotten into a fight with a customer, but she said it was not a legal firing. (Tr. 28). Arriola said she had been in treatment eight times and had been able to maintain her employment while in treatment. (Tr. 29).

Arriola said she had pain in her legs, arms, and back, and that a physician at a clinic in Lincoln diagnosed her with fibromyalgia. (Tr. 32-33). She said the pain was constant and rated it at six on a scale of one to 10, but she had flare-ups which lasted a couple of days when the pain was eight on a scale of one to 10. (Tr. 33). She said she had a bulged disc that made it hard for her to bend or stoop, walk, or sit. (Tr. 34). Arriola said she can sit for 30 minutes and then must stand up. To relieve the pain, she lies down on her side or uses a heating pad. (Tr. 34). Arriola said she does not do housework because she cannot run a vacuum cleaner and a mopping motion hurts her back. (Tr. 35).

Arriola said her bipolar disorder causes her to have days when she is hyper and other days when she is depressed. (Tr. 36). She had anxiety because her daughter was not talking to her. (Tr. 37). She said she is afraid to be away from home. (Tr. 38). At the grocery store, she felt as if people were looking at her because she previously worked there. She stated that she left the house for one appointment a week with a counselor, a group meeting once a week, and a biweekly meeting with a counselor. (Tr. 38). Arriola

stated she tried to look for a job, but she had not put 100 percent into it because she had received unemployment benefits between April 2009 and June 2010. (Tr. 39).

Arriola said she took showers because she could not get in and out of a bathtub and she wore slip-on shoes because she has difficulty bending over to tie her shoes. (Tr. 39). Arriola said she was in the hospital in April when she felt suicidal because she was living in a homeless shelter and her daughter was not talking to her. (Tr. 41).

The ALJ ordered a consultative psychological examination.

## D.   Additional Evidence

On March 3, 2014, Arriola's attorney submitted a letter dated February 28, 2014, and nine pages of additional medical records, dated between October 18, 2013, and January 2, 2014 (ECF No. 27). The defendant filed a brief in opposition to the document, arguing that the records are not material and are cumulative, in part because they relate to a time after the ALJ's decision, filed on March 30, 2012. The Appeals Council's decision was entered on February 16, 2013.

The court has reviewed the additional evidence and finds that it is cumulative and not material, and, therefore, it has not been considered in the decision. In order for additional evidence to form the basis for remand under 42 U.S.C. § 405(g), the claimant must show that the evidence is material and that there was good cause for the failure to incorporate that evidence into the record before the Commissioner. *See Mouser v. Astrue*, 545 F.3d 634 (8th Cir. 2008). For evidence to be considered material, it must be "'non-cumulative, relevant, and *probative of the claimant's condition for the time period for which benefits were denied.*'" *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997) (emphasis supplied), *quoting Woolf v. Shalala*, 3 F.3d 1210, 1215 (8th Cir.1993).

20

The evidence offered by Arriola is not material because it relates to her mental health in October 2013, December 2013, and January 2014, which is more than 18 months after the ALJ's decision of March 30, 2012. It therefore is not probative of Arriola's condition for the time period for which benefits were denied. *See Goad v. Shalala*, 7 4.3d 1397, 1398 (8th Cir. 1993) (reports of claimant's condition 20 months after the ALJ's decision are not closely enough related in time to either the ALJ's decision or the Appeals Council's denial of review to warrant remand.)

## III.  STANDARD OF REVIEW

This court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  *See also Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find

21

substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

This court must also determine whether the Commissioner's decision "is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law."  *Id*. (citations omitted).  No deference is owed to the Commissioner's legal conclusions. *See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003).  *See also Collins*, *supra*, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

### A. Determination of RFC

Arriola first argues that the ALJ failed to apply the disability impairments to her ability to perform actual work functions. In support, she relies on *Lauer v. Apfel*, 245 F.3d 700 (8th Cir. 2001), in which the appellate court reversed the denial of disability benefits. The U.S. Court of Appeals for the Eighth Circuit found that in order to determine the claimant's RFC, the ALJ had to address complex medical issues that could be resolved only with professional assistance, and that the professional opinions in the record did not support the ALJ's assessment of the degree to which the mental impairments affected the claimant's RFC. The court concluded that the ALJ's determination of the claimant's RFC was not supported by substantial evidence. *Id*. Arriola's reliance on *Lauer* is misplaced. The ALJ in this case properly considered the

professional opinions in the record, and the ALJ's determination of Arriola's RFC was supported by substantial evidence.

In determining Arriola's RFC, the ALJ found that Arriola had mild restriction in activities of daily living, as evidenced by her ability to take care of herself and to attend AA meetings and counseling. (Tr. 12). In social functioning, Arriola had moderate difficulties. She had reported problems getting along with others and had been arrested for stealing. (Tr. 12). She had moderate difficulties in concentration, persistence, or pace, and limited intelligence. (Tr. 12).

The ALJ found that Arriola had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.697(b), except that she was limited to work involving simple to intermediate level instructions and involving only superficial contact with the public. (Tr. 12). The ALJ found that Arriola's medically determinable impairments could reasonably be expected to cause the alleged symptoms; but her statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment. (Tr. 13). The ALJ determined that Arriola was capable of performing past relevant work as a cashier, which is considered semi-skilled and light exertional work. (Tr. 15). The vocational expert's analysis found that Arriola worked as a grocery cashier from May 1997 to April 2009. (Tr. 15).

As to Arriola's complaints of back pain and myalgias, the ALJ noted that imaging from May 2010 showed mild narrowing at L5/S1 of the lumbar spine. She was told she needed to consider physical therapy, but she declined; and she was told to limit her use of Vicodin. (Tr. 13). The ALJ gave the opinions of Dr. Spethman and Dr. Knosp

significant weight because there was no medical opinion in evidence to dispute their findings. The ALJ determined that Arriola should be limited to light exertional work based on her total history including a remote history of back surgery. She had been found to have a normal gait and posture. There were no specific examinations that documented findings to support a diagnosis of fibromyalgia. (Tr. 13).

The ALJ gave significant weight to the opinion of Schroeder because it showed Arriola's current condition and reviewed her full background and substance abuse issues. (Tr. 14). The opinions of Branham and Milne were considered but were given less weight because additional evidence had been obtained from Schroeder. The implied opinion of Schaffer that Arriola may have limitations in her ability to work was given less weight than Schroeder's specific findings. (Tr. 14).

The ALJ noted that it was difficult to further assess Arriola's mental condition from the alleged onset date to December 2010 because it was intertwined with her drug and alcohol abuse. (Tr. 15). Arriola stated she had been sober since December 2010, but the record indicated an incident with alcohol in April 2011. By the time Arriola was seen by Schroeder, she was in remission from drug and alcohol abuse, and Schroeder's conclusions were given significant weight as showing that Arriola was mentally capable of sustaining work. (Tr. 15).

As noted above, the RFC represents the most the claimant can do despite her limitations. It is based on relevant evidence in the record. *See* 20 C.F.R. § 404.1545(a), 416.945(a). The ALJ must take into consideration the objective medical evidence, the medical opinions, and the statements of any others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence

24

showing how the claimant's impairments and related symptoms affect her ability to work. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a). The ALJ evaluates every medical opinion, and considers whether the medical source examined the claimant, whether the medical source was a treating source, the length, nature, and extent of the medical source's treatment relationship with the claimant, whether the medical source's opinion was supported with relevant evidence, including medical signs and laboratory findings, whether the medical source's opinion was consistent with the record as a whole, and whether the medical source was a specialist. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

The ALJ determined that Arriola could perform light work, which is consistent with the significant weight given to the opinions of Drs. Spethman and Knosp. The physicians found that Arriola could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours and sit for about six hours in an eight-hour work day. She had no pushing, pulling, postural, manipulative, visual, communicative, or environmental limitations. (Tr. 312-15, 371-72). These opinions are supported by the medical evidence, which showed that Arriola was found on a regular basis to have normal pulses, sensation, motor abilities, and range of motion. (Tr. 255-56, 261-62, 265, 270-71, 324-25, 327-28, 463, 470, 501, 508, 558, 798, 804, 957-58, 1027, 1028-29). She also had normal gait, station, posture, and strength, and her straight-leg testing was negative. (Tr. 262-63, 265, 270-71, 324-25, 327-28, 463, 476, 508). X-rays of her back and pelvis were normal. (Tr. 558, 798, 800-02, 997, 999-1000, 1029). Heart testing showed no ischemia and a normal ejection fraction. (Tr. 986-88). The medical records support the opinions of Drs. Spethman and Knosp that Arriola could perform light work.

In addition, the medical opinions were supported by Arriola's continued work activity. She reported on several occasions that she continued working after her alleged onset of disability. (Tr. 243, 326, 797). Pursuant to 20 C.F.R. § 404.1571, work done by a claimant during any period in which she believes she is disabled may show that the claimant is able to work at the substantial gainful activity level. "If you are able to engage in substantial gainful activity, we will find that you are not disabled." *Id.* Working generally demonstrates an ability to perform a substantial gainful activity. *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005).

Arriola also collected unemployment benefits for a year after her alleged onset of disability, which indicated that during that time she held herself out as ready, willing, and able to work in order to collect unemployment benefits. (Tr. 39). "[T]he acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability." *Cox v. Apfel*, 160 F.3d 1203 (8th Cir. 1998). Arriola stated on several occasions that she continued to look for work. (Tr. 39, 236, 241). *See Mitchell v. Sullivan*, 907 F.2d 843, 844 (8th Cir. 1990) (searching for employment inconsistent with disabling limitations.)

The medical opinions were also supported by evidence that Arriola stopped working for reasons other than disability. She told Dr. Johnson that she was fired from her job as a cashier due to a conflict with a customer. (Tr. 243). "Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." *Goff, supra*, 421 F.3d at 793.

The physical limitations of the ALJ's RFC finding are supported by substantial evidence. As for the mental limitations, they are also supported by the evidence. The

ALJ found that Arriola could perform work with simple to intermediate level instructions and superficial contact with the public. (Tr. 12). Branham and Milne both opined that Arriola had only a moderate limitation in social functioning and concentration, persistence, or pace. (Tr. 302, 370). Schroeder also opined that Arriola seemed to understand most directions given to her, could follow short and simple instructions, and was able to relate appropriately to coworkers and supervisors. (Tr. 1046).

Throughout the record, medical sources reported that Arriola was alert, oriented, and in no acute distress. (Tr. 256, 261-62, 270-71, 280, 364-65, 798, 851, 871-72, 1028-29, 1044-45). She maintained good grooming, adequate judgment, stable mood, and a normal thought pattern. Any variance in her behavior followed substance abuse and noncompliance with treatment. (Tr. 236-237, 238, 241, 243, 270, 280, 286, 287, 288, 329, 364-65, 455, 456, 851, 871-72, 1020, 1028-29, 1044-45). Drug abuse or alcoholism may only be considered a contributing factor in determining disability. *See* 20 C.F.R. §§ 404.1535, 416.935. In addition, the failure to follow prescribed medical treatment without good cause is a basis for denying benefits. *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004).

There was also evidence that Arriola's mental impairments were effectively treated by medication, which supported the mental health evaluations of Branham, Milne, and Schroeder. (Tr. 238, 241, 248, 270, 288, 284, 326, 327, 342, 359, 455, 521). Impairments that are controllable or amenable to treatment do not support a finding of disability. *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009). In addition, medical opinions were provided that Arriola may have been attempting to appear that she was functioning at a lower level than her actual level. (Tr. 1044, 1046). The appellate court

has upheld an ALJ's discounting of complaints based on objective evidence that the claimant was exaggerating symptoms and giving less than full effort. *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). Arriola's allegation that the ALJ failed to apply her impairments to her ability to perform actual work functions has no merit. The evidence supports the ALJ's RFC.

## B. Consideration of GAF

Arriola also argues that the ALJ erred in failing to discuss the impact of a person's global assessment of functioning (GAF) score of 50 on her ability to work on a consistent basis. "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental-health illness.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n. 1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)).

Arriola was assigned a GAF score 52 on June 22, 2010. (Tr. 283). In September 2010, her GAF was 58 when she was hospitalized for psychiatric evaluation. (Tr. 873). Upon discharge, her GAF was 60. (Tr. 848). When she entered St. Monica's for treatment in October 2010, her GAF was 50, (tr. 412) and when she was discharged, her GAF was 58. (Tr. 809). Schaffer assigned a GAF score of 50 in December 2010. (Tr. 365). When Arriola was hospitalized in April 2011, her GAF was 35 upon admission and 60 upon discharge. (Tr. 910-11). In January 2012, Schroeder assigned Arriola a GAF score of 52, and noted that the highest score in the past year was 56. (Tr. 1047).

A GAF of 41 to 50 indicates the individual has "[s]erious symptoms. . . or any serious impairment in social, occupational, or school functioning. . . ." *Pate-Fires v.*

*Astrue*, *supra*, 564 F.3d at 937, n. 2, citing DSM–IV at 32. A GAF of 51 to 60 indicates the individual has "[m]oderate symptoms. . . or moderate difficulty in social, occupational, or school functioning. . . ." *Pate-Fires v. Astrue*, *supra*, 564 F.3d at 937, n. 3, citing DSM–IV at 32.

The ALJ noted that Schaffer assigned Arriola a GAF score of 50, which indicated serious symptoms. (Tr. 14). Branham, Milne, and Schroeder all opined that Arriola could perform a range of work consistent with the ALJ's RFC finding. (Tr. 302, 370, 1046). As previously discussed, the ALJ's mental RFC finding was supported by the opinions of the mental health professionals. Schaffer's GAF score of 50 did not show that Arriola could not work. In fact, as noted earlier, Arriola continued to work or to look for work at several times when her GAF was between 50 and 56.

It is also important to note that the Commissioner has declined to endorse the GAF scale for use in Social Security and SSI disability programs. *See Halverson v. Astrue*, 600 F.3d 922, 930-31. However, GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning. *Id.*, *citing Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the [residual functional capacity], it is not essential to the RFC's accuracy."). The record does not suggest that the ALJ failed to consider the GAF score in assessing Arriola's mental RFC.

## V. CONCLUSION

For the reasons discussed, the court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

IT IS ORDERED:

1.      The Commissioner's decision is affirmed;

2.      The appeal is denied; and

3.      Judgment in favor of the defendant will be entered in a separate document.

Dated this 22nd day of May, 2014

                                        BY THE COURT:


                                        s/Laurie Smith Camp
                                        Chief United States District Judge